121 So.2d 235

Ella Townsen CLEMENT

v.

SNEED BROTHERS et al.

Nos. 44222, 45040.

May 31, 1960.

Rehearing Denied June 29, 1960.

See also 238 La. 614, 116 So.2d 269.

McClendon & Benton, Minden, Hargrove, Guyton & Van Hook, Shreveport, for defendants-appellants.

Roy M. Fish, Springhill, for plaintiff-appellee.

HAMITER, Justice.

Mrs. Ella Townsen Clement instituted this suit against the partnership of Sneed Brothers and the individual members thereof, namely, S. T. Sneed, Jr., W. J.

Sneed, M. H. Sneed and Hugh M. Sneed, to obtain the annulment of an oil, gas and mineral lease which she executed in favor of such defendants, it bearing date of February 2, 1954 and affecting some 150 acres of her lands located in Webster Parish. Additionally, she demanded an award of damages in the sum of $84,735, allegedly the cost of drilling a well on her property, she claiming that the defendants breached a Side Letter of Agreement (quoted in full hereinafter) which she entered into with them in contemplation of and as a prerequisite for the execution of the aforementioned lease.

After trial, and following the death of Mrs. Clement, the district court rendered a judgment decreeing the lease to be null and void and condemning the defendants in solido to pay to C. B. Townsen, administrator of the succession of Ella Townsen Clement, the sum of $60,000 and all costs of this suit.

The defendants appealed suspensively and devolutively from the judgment.

Pending the appeal there were substituted for Mrs. Ella Townsen Clement (although having died, she is hereinafter sometimes termed the plaintiff), as well as for the administrator of decedent's succession, her four heirs at law, namely, Mrs. Lela Townsen Bacle, Mrs. Clyde Townsen Patterson, Columbus B. Townsen and R. L. Townsen. Later, however, the interests in

this cause of the last two named heirs were acquired by the defendants (see Number 45,040 on the docket of this court); hence, they are no longer parties litigant.

The lease in question, for which defendants paid in cash the sum of $5,250, is the usual commercial lease and provides for a primary term of five years. Among other things, it recites: "If operations for drilling are not commenced on said land on or before one year from this date, the lease shall then terminate as to both parties unless on or before such anniversary date lessee shall pay or tender to lessor * * * the sum of One Hundred Fifty and no/100 Dollars ($150.00), (herein called rental) which shall cover the privilege of deferring commencement of drilling operations for a period of twelve (12) months. In like manner and upon like payments or tenders annually the commencement of drilling operations may be further deferred for successive periods of twelve (12) months each during the primary term. * * * "

The Side Letter of Agreement, which all parties concede is an integral part of the lease and must be considered with it, reads in full as follows:

"Mrs. Ella Clement
Agreement with
Sneed Bros.

"Side Letter of Agreement.
"On the 22nd day of July, 1954, a verbal agreement was entered into by and between Mrs. Ella Clement and Sneed Brothers represented by S. T. Sneed, Jr., and W. J. Sneed. At this time an agreement was entered into in which the Sneed Brothers would pay to Mrs. Ella Clement and others of the Clement Heirs $35.00 per acre for their mineral lease on properties located in the East Half of Section 34, and the West Half of Section 35, Township 22 North, Range 9 West, Webster Parish, La. and in parts of the North East Quarter of Section 3, and the Northwest Quarter of Section 2, Township 21 North, Range 9 West, Webster Parish, La.

"It was at this time a decision to use the same leases that were used in a former agreement, and the dates of the said leases in this agreement would be dated February 2nd, 1954. These leases were in the hands of Attorneys Campbell and Campbell of Minden, La. Upon contacting Mr. John T. Campbell, he advised that new leases must be prepared and it was then agreed by all parties that new leases would be prepared but the original date of Feb. 2nd would be placed in the new leases.

"On Monday, July 26th, Cashiers checks were delivered by Sneed Brothers to Mr. John T. Campbell for the full bonus on the purchase price of the above stated leases. The Cashiers checks were attached to the newly

made out leases and each of the said lessors was to sign the leases. Supplemental abstracts were ordered as of that date by Mr. Campbell and Mr. S. T. Sneed, Jr., and said monies were to be released to the lessors upon the release of the leases to the lessee with a satisfactory full title opinion as per Mr. Campbell who is the acting attorney for the lessors.

"The said Sneed Brothers further agreed with Mrs. Ella Clement that within one year from the date of July 22nd, 1954 that they would drill or cause to be drilled a well on her land or on lands that would be pooled therewith.

"It was further agreed and understood that there being lands already leased that at one time was a part of the Clement Estate that Mrs. Ella Clement in co-operation with the Sneed Brothers, agreed to a letter form of agreement for the drilling committment within the said lease in order that Sneed Brothers would have time to attempt to obtain farm-out agreement from parties who owned this outstanding acreage. This farm-out agreement is now in a trading stage and upon the completion of said agreement there shall be enough acreage for the drilling of a well on the lease of Mrs. Ella Clement or the lands that shall have to be pooled therewith.

"If this letter is in accord with the aforesaid verbal agreement, then the parties of the said agreement will sign in the place allotted for their signature below."

It is the contention of plaintiff that the Side Letter of Agreement contains an unconditional and compulsory obligation on the part of the defendants to drill a well on her lands within a year from July 22, 1954; and that since such obligation was not discharged she is entitled not only to a cancellation of the lease but also to damages (for which she prayed) amounting to the cost of drilling and completing the well.

The defendants, on the other hand, contend that the drilling provision in the Side Letter of Agreement was not unqualified; that it, by its very language, was conditioned on plaintiff's promise to voluntarily unitize her lands with those of others; and that her later arbitrary refusal to sign tendered voluntary unitization contracts made it impossible for them to comply with the drilling commitment.

By giving consideration only to the language within the four corners of the Side Letter of Agreement we cannot reach a conclusion favorable either to the contention of plaintiff or to that of the defendants. Certainly an intention to create a drilling obligation affecting solely Mrs. Clement's lands, such as plaintiff contends for, is not indicated by the provision that the defendants would "drill or cause to be

drilled a well on her land or *on lands that would be pooled therewith*" and by the further recitation that "there shall be enough acreage for the drilling of a well on the lease of Mrs. Ella Clement *or the lands that shall have to be pooled therewith.*" Nor is there verbiage in the contract showing, as defendants urge, that Mrs. Clement obligated herself to voluntarily unitize her lands with those of others.

Moreover, treating the Side Letter of Agreement as being ambiguous as we do, the extrinsic evidence adduced at the trial of the cause does not satisfactorily disclose a single mutual intention of the contracting parties.

Plaintiff unequivocally testified that she did not intend to agree to voluntary unitization; that under no circumstances would she have signed an agreement requiring her to pool her lands with those of others; and that "it was thoroughly understood before we leased that there would be no unitization." The references in the agreement to pooling, she said, pertained only to forced unitization—"what the state required". And other witnesses testified that Mrs. Clement had often expressed strong opposition to voluntary pooling.

Contrawise, the Sneed Brothers were just as positive in their testimony that they never agreed unconditionally to drill a well on plaintiff's lands; that their drilling commitment, along with the cash bonus for the lease of $5,250 or $35 per acre, would not have been given to plaintiff without her promise to execute a voluntary unitization agreement; and that it was their understanding and intention that the drilling obligation was conditioned on obtaining a satisfactory unitizing of sufficient lands in the area. And lending corroboration to their testimony are the facts that the lands of plaintiff were located in wild cat territory and that she had been unable to get anyone else to give a drilling commitment without a voluntary unitization agreement.

Tending also to support the contention of the defendants that there was no unqualified and compulsory obligation on their part to drill solely on plaintiff's lands is the further fact that on July 25, 1955, or three days after the expiration of the drilling commitment, plaintiff's then counsel wrote to defendants requesting merely a formal release of the lease in question, the letter containing no demand for immediate drilling or for the damages herein sought.

Considering that each of the above mentioned conflicting contentions is supported by strong evidence, which undoubtedly was sincerely and honestly elicited, it is apparent to us that Mrs. Clement and the Sneed Brothers entertained different intentions with respect to an important and a crucial matter in the confection of the Side Letter of Agreement. And such difference produced the same effect as that found to have resulted in Jones v. Janes, 156 La. 715, 101

So. 116, 117, from which we quote the following: "A contract is incomplete unless there be a meeting of the minds of the parties upon the common ground of a mutual understanding of facts and of subject-matter. Not only must the parties understand alike, but their contract must afford a complete expression of this meeting of minds, and leave no material element unexpressed. * * *

"The free mutual assent of the parties is necessary to constitute a contract. * * *

"If this assent is wanting on the part of one who signs a contract, his act has no more efficacy than if it had been done under duress or by a person of unsound mind. * * *

" 'It is essential to a contract that the nature and extent of its obligations be certain. If an agreement is uncertain it is because the offer was uncertain or ambiguous to begin with, for the acceptance is always required to be identical with the offer, or there is no meeting of minds and no agreement.' * * *

" 'Every agreement, whether written or oral, is the result of, and springs from, an offer and the acceptance thereof. The offer and the acceptance must have the characteristics of a bargain and must be conventional counterparts.' * * * "

Also pertinent here is Cheramie v. Stiles, 215 La. 682, 41 So.2d 502, 504, wherein we

said: " 'Contracts are founded on the agreements, not on the disagreements, of the parties. Where they misunderstand each other, there is no contract.' * * * "

The quoted pronouncements from the Jones and Cheramie cases give recognition to the following provisions of the LSA–Civil Code:

"Art. 1797. When the parties have the legal capacity to form a contract, the next requisite to its validity is their consent. This being a mere operation of the mind, can have no effect, unless it be evinced in some manner that shall cause it to be understood by the other parties to the contract. * * *

"Art. 1798. As there must be two parties at least to every contract, so there must be something proposed by one and accepted and agreed to by another to form the matter of such contract; the will of both parties must unite on the same point."

In view of the announced legal principles and the circumstances pointed out above we must and do conclude that the Side Letter of Agreement was not a binding contract. And since the lease assailed herein was dependent on that agreement's existence and validity, as is conceded by all parties, such lease was likewise null and void.

For the reasons assigned the judgment appealed from is amended by eliminating and deleting therefrom the award of dam-

ages is favor of plaintiff and against the defendants; and, as thus amended, the judgment is affirmed. Costs of this court shall be paid in the proportion of one-half by plaintiff and one-half by the defendants.

HAWTHORNE, J., concurs in the decree.

McCALEB, Justice (concurring).

I agree with the majority that an intention to create a drilling obligation affecting solely Mrs. Clement's lands is not indicated by the provision that the defendants would "drill or cause to be drilled a well on her land or on lands that would be pooled therewith" or the provision that "there shall be enough acreage for the drilling of a well on the lease of Mrs. Ella Clement or the lands that shall have to be pooled therewith". I also agree that there is no verbiage in the contract which shows that Mrs. Clement obligated herself to voluntarily unitize her lands with those of others.

However, I cannot agree that the above stated circumstances demonstrate that the Side Letter of Agreement, albeit inartistically drawn, is ambiguous. It appears to me that the language of the agreement shows that Sneed Brothers obligated itself to drill, but had the choice of drilling on the land of Mrs. Clement, or on lands that would be pooled therewith. Since there were no lands "pooled therewith" at the

time of the agreement, the parties obviously must have been looking to the possibility of pooling in the future and I think the agreement itself signifies the intention of the parties that a voluntary unitization agreement would be confected as soon as the "farm-out agreement", which was then "in the trading stage", was completed. Thus, even though Mrs. Clement was not obligated to pool her lands with others, a refusal by her to include her lands in a reasonable pooling arrangement amounted to her preventing Sneed Brothers from complying with its agreement to drill and released it from that obligation.

It must follow from this that, once Sneed Brothers no longer had an obligation to drill, it should have been able to keep the lease alive by no more than the proper payment of delay rentals as provided for in the lease. However, although Sneed Brothers alleged in its answer that it was entitled to have the lease extended for a period equal to the period of this litigation, it has abandoned this claim as it appears from the brief of its counsel submitted to this court that it is no longer contending that the lease is in effect. Therefore, the decree herein approving the judgment below to the extent that it cancelled the lease between the parties accords with the views I entertain.

The majority ruling herein produces unforeseen results insofar as Mrs. Clement is concerned. For, if the lease is null be-

cause of the lack of consent of the parties, Mrs. Clement is duty bound to restore the bonus of $35 per acre she received from Sneed Brothers as well as any rental payments, in order that the matter be placed in status quo. Yet, actually and factually, Sneed Brothers have had the right of entry on Mrs. Clement's property for the exploration of minerals during the primary term of the lease.

It is for this reason, among others, that I cannot subscribe to the majority ruling. The principal *cause* in the case, as I see it, was the leasing of the property for oil development. A lease was made for a valuable consideration and this was all that was necessary to effect a binding contract.

True enough, a side agreement was made by which Sneed Brothers agreed to drill a well on the property or on property unitized therewith. The fact that a disagreement exists as to the intent of the parties in that agreement does not warrant a holding that the lease contract was a nullity.

Article 1823 of the Civil Code provides that "Errors may exist as to all the circumstances and facts which relate to a contract, but it is not every error that will invalidate it. To have that effect, the error must be in some point, *which was a princi-pal cause for making the contract,* and it may be either as to the motive for making the contract, to the person with whom it is made, or to the subject matter of the contract itself". (Italics mine).

Article 1825 declares: "The *error in the cause* of a contract to have the effect of invalidating it, *must be on the principal cause,* when there are several; *this principal cause is called the motive,* and means *that consideration* without which the contract would not have been made." (Italics mine).

The principal cause, as I see it, for Mrs. Clement's making the lease was the substantial bonus payment together with the rental she would receive. In addition, it was her desire that the lessee develop the property and this prompted the making of the "side" agreement. But the side agreement was not *the principal cause* or the "consideration without which" it can be fairly said "the contract would not have been made". So, even if the majority opinion be correct in declaring that there was no meeting of minds anent the conditions under which a well would be drilled, it does not necessarily follow that the lease executed by the parties is a nullity.

I respectfully concur in the decree.